**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **JAIME ANN OWEN,** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:10-CV-1439-BH** |
| | § | |
| **MICHAEL J. ASTRUE,** | § | |
| **Commissioner of Social Security,** | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM OPINION AND ORDER

Pursuant to the consent of the parties and the order of reassignment dated October 28, 2010, this case has been reassigned for the conduct of all further proceedings. Before the Court are *Plaintiff's Motion for Summary Judgment*, filed October 29, 2010, and *Defendant's Motion for Summary Judgment*, filed November 24, 2010. Based on the relevant filings, evidence, and applicable law, Plaintiff's motion is **GRANTED** in part, Defendant's motion is **DENIED** in part, and the case is **REMANDED** to the Commissioner for reconsideration consistent with this opinion.

## I. BACKGROUND[1]

### A.     Procedural History

Plaintiff Jaime Ann Owen ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her claim for disability benefits under Title II of the Social Security Act. On May 23, 2007, Plaintiff applied for disability insurance benefits, alleging disability since October 19, 2006, due to fatigue, multiple chemical sensitivities,

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "R."

neurotoxicity, and environmental illness.  (R. at 46, 146.)  Her application was denied initially on

October 11, 2007.  (R. at 46-50.)  She timely requested a hearing before an Administrative Law

Judge ("ALJ"), and personally appeared and testified at a hearing held on September 14, 2009.  (R.

at 22-45, 52-54.)  On December 15, 2009, the ALJ issued a decision finding Plaintiff not disabled.

(R. at 9-16.)  The Appeals Council denied her request for review and the ALJ's decision became the

final decision of the Commissioner.  (R. at 1-5.)  Plaintiff timely appealed the Commissioner's

decision to the United States District Court pursuant to 42 U.S.C. § 405(g).

**B.**      **Factual History**

      **1.**      **Age, Education, and Work Experience**

Plaintiff was born on May 8, 1978, was 28 years old on her alleged onset date, and was 31

years old at the time of the hearing before the ALJ.  (R. at 90.)  She has a bachelor of arts degree in

sociology, and peace and conflict studies (R. at 30-31), and has past relevant work as a community

outreach worker (R. at 15).

      **2.**      **Medical Evidence**

On November 22, 2006, Plaintiff visited the Emergency Room ("ER") at St. Joseph Mercy

Hospital in Michigan complaining that her eyes were sensitive to light.  (R. at 248-49.)  Medical

records from that visit reflect that Plaintiff had smoked marijuana about five weeks earlier while out

of the country and started having some strange sensations.  (R. at 248.)  She saw a physician there

who explained that the symptoms were probably caused by the amphetamines sometimes found in

large quantities in marijuana.  (*Id.*)  She did relatively well the next couple of weeks, but smoked

marijuana again and developed a diffuse erythematous rash, dizziness, and intermittent numbness.

(*Id.*)  She then presented herself to the ER where she was diagnosed with a rash and possible toxic

ingestion, and was sent home on Benadryl. (R. at 249.) The attending physician noted that Plaintiff had a rash on her back and stomach but was awake and alert and had no eye, ear, nose, neck, respiratory, cardiovascular, musculoskeletal or neurological findings. (*Id.*)

On November 22, 2006, Plaintiff visited the University of Michigan Hospital in Ann Arbor ("UMH") with complaints of intermittent dizziness. (R. at 257.) She claimed that she first experienced dizziness or mild lightheadedness when she was cleaning her home with a bleach water solution the previous Sunday. (*Id.*) The lightheadedness lasted about fifteen minutes but recurred again. (*Id.*) She believed that the marijuana she had smoked five weeks earlier was "laced with something." (*Id.*) Her physical examination and labs were normal, and she was noted to have no neurological deficits or "ominous neurological signs," no anxiety, and no depression. (R. at 258-59.) She did not have a rash, only small sporadic lesions in some areas of her skin, and the rest of her skin was warm and dry. (R. at 258.) She was diagnosed with dizziness, noted to be in stable condition, advised to avoid marijuana and drug use, and discharged. (R. at 259.)

During a follow up visit at UMH on November 27, 2006, Plaintiff reported that she was studying in Guyana on a scholarship when she smoked some marijuana and started feeling unwell. (R. at 260.) She reported that since the marijuana use, she had pinpoint pupils, episodic feelings of heat in different parts of her body, some pain in her upper pectoral area, sores or rashes on her body, some initial numbness in her hands, and weakness in her right hand and foot. (R. at 261.) She also reported feeling stress and isolation, difficulty concentrating, and sleep disturbance. (*Id.*) She reported, however, that the symptoms had been improving over the last weeks, she was feeling "somewhat back to usual," and planned to return to Guyana the next day. (R. at 260.) Jane McCort, M.D., noted that while Plaintiff was concerned with exposure to marijuana or a pesticide, she had been taking Doxycycline since her travel to Guyana, and her symptoms had improved with

discontinuation. (R. at 263.) She also believed that Plaintiff's rash seemed to be healing and was consistent with pityriasis rosea, which did not normally accompany systemic illness. (R. at 262-63.) Plaintiff's physical exam and general labs were normal, and Dr. McCort planned to check her toxic screens and heavy metal screen and do some more reading on possible side effects of Doxycycline, especially in hot sunny climates. (*Id.*)

On December 1, 2006, Plaintiff returned to UMH for a follow-up. (R. at 264.) She appeared alert and expressive, "more relaxed, in good spirits, and in no acute distress." (*Id.*) Her initial drug screen was positive for Effexor and Topamax, and Plaintiff reported that she had not knowingly taken either of those. (*Id.*) Dr. McCort thought that the caffeine in Plaintiff's most recent urine specimen was probably consistent with her history. (*Id.*) She noted that Plaintiff's multiple symptoms seemed to be improving with time. (*Id.*)

On January 1, 2007, Plaintiff was seen by an ER physician at Detroit Receiving Hospital for complaints of depression. (R. at 331, 334.) The physician noted that there were no neurological or psychiatric problems, no problems with her other systems, and that she appeared alert and oriented with no distortion of perception. (R. at 334-35.) The physician noted, however, that she appeared anxious, depressed, and withdrawn. (R. at 335.) His final impression was that she had depression. (R. at 331.)

On October 6, 2007, Victor Cherfan, D.O., examined Plaintiff at the request of the Disability Determination Services ("DDS"). (R. at 299-301.) Plaintiff reported fatigue since March 2007, and undergoing multiple tests that all came out normal except for an adrenal deficiency. (R. at 299.) She complained of multiple chemical sensitivities, environmental illnesses, and neurotoxicity, and stated that because of her lack of insurance, she was unable to seek proper consultation for these issues. (*Id.*) Dr. Cherfan noted that Plaintiff had a completely normal exam with no skin, eye, neck,

chest, heart, abdomen, musculoskeletal, or neurological abnormalities, and negative Tinel's and Phalen's tests regarding her hand numbness and tingling. (R. at 300.) He reported that Plaintiff had been diagnosed with adrenal insufficiency and placed on Hydrocortisone, and that the results from other tests for her problems had been normal up to that time. (R. at 300.)

On October 11, 2007, DDS noted in a physical residual functional capacity ("RFC") that Plaintiff claimed that she had an irregular sleeping schedule and slept much longer, had no problems with personal care tasks, could not use personal care products due to chemicals, prepared her meals with organic products, could clean with non-toxic cleaning agents, could do dishes and laundry but no outside work, had difficulty climbing stairs, and had difficulty with memory, concentration, understanding, and getting along with others. (R. at 308.) The DDS found that these statements were not inconsistent with the medically determinable impairment but were only partially credible. (*Id.*)

On August 14, 2008, Dana E. Regett, a licensed clinical social worker, summarized Plaintiff's history of weekly outpatient psychotherapy from January 5, 2006 until August 23, 2006, and ten psychotherapy sessions by telephone between March 8, 2007 and February 14, 2008. (R. at 312-13.) She stated that plaintiff initially discussed her adjustment problems with graduate school, her anxiety and depression, her poor self esteem, and her anger and disappointment in her significant interpersonal relationships. (R. at 312.) She also expressed regret and guilt over her decision to have an abortion at age 23; she reported it as a traumatic event that had a strong and enduring psychological impact on her and resulted in ongoing feelings of depression. (*Id.*) Upon her return from Guyana, she felt sad and hopeless with a great sense of loss and had some thoughts of suicide – symptoms consistent with a diagnosis of a major depressive episode. (R. at 313.)

On October 27, 2008, Amy L. Dean, D.O., stated in a letter that Plaintiff had been under her

care since March 2007 for toxic neuropathy, toxic encephalopathy, and chemical sensitivities, and that the impairments appeared to be the result of an acute exposure to pesticides during her graduate studies in Guyana. (R. at 374.) She stated that Plaintiff was required to be seen once a month for follow-up visits, required one IV of intravenous nutrients per month, and required oral nutritional supplements on a daily basis for her condition. (*Id.*) She opined that Plaintiff was unable to work due to those medical conditions. (*Id.*)

On November 18, 2008, Plaintiff had a neuropsychological consultation with Nancy A. Didriksen, Ph.D., a specialist in evaluation and treatment of chemically or environmentally sensitive patients or patients exposed to toxic or neurotoxic substances. (R. at 315-329.) Plaintiff reported that her existing health problems varied according to exposures, but included fatigue, insomnia, depression, anxiety, diminished intellectual functioning, vision changes, twitching, tremors, muscle jerking, nausea, emotional numbness, physical pain and discomfort, and fear. (R. at 319.) She also reported that she required at least twelve hours of sleep, was able to attend to basic self-care needs, and her activities throughout the day included internet searches, watching television, talking on the phone, preparing food, yoga, and leaving the house for physician appointments or to go to a whole foods market. (*Id.*) She stated that she required frequent rest periods and was unable to do much housework until she experienced a bout of energy which might occur once every six weeks. (*Id.*)

Dr. Didriksen diagnosed her with cognitive disorder, adjustment disorder with mixed anxiety and depressed mood, chemical and environmental sensitivity, and chronic fatigue. (R. at 328-29.) Plaintiff's personality profile "indicated significantly above average levels of depression, anxiety, inappropriate guilt, social isolation and withdrawal, and significantly reduced self confidence and self-esteem." (R. at 327.) It also indicated that Plaintiff would likely be "easily overwhelmed by any stressors, but particularly when reacting to environmental incitants." (*Id.*) Dr. Didriksen stated

- 6 -

that Plaintiff had withdrawn herself from any type of social interaction to protect herself from incitants found in ordinary environments, and her only social life was through the telephone or the internet. (*Id.*) She opined that Plaintiff's "exquisite sensitivity was obvious" and "there was no evidence of malingering." (R. at 316.) She pointed out that her tests were a valid indication of her current level of neurocognitive and behavioral functioning under environmentally-safe and non-stressful conditions, and that her "extreme chemical sensitivity resulting in a variety of neurocognitive, physical, and psychological symptoms, in addition to her decreased memory functioning argue most strongly against return to work in any workplace setting, now and in the foreseeable future." (R. at 328.)

William J. Rea, M.D., saw Plaintiff at the Environmental Health Center in Dallas on January 19, 2009. (R. at 380-82.) Plaintiff made several subjective complaints. (R. at 381.) Upon physical examination, Dr. Rea noted that most of her systems, including her neurological and musculoskeletal systems, were normal, except that she had a positive Romberg sign and a tender mass near her sinuses. (*Id.*) His assessment included toxic encephalopathy and chemical sensitivities. (R. at 382.)

### 3. Hearing Testimony

On September 14, 2009, Plaintiff and a vocational expert ("VE") testified at a hearing before the ALJ. (R. at 22-45.) Plaintiff was represented by an attorney. (R. at 22.)

#### a. *Plaintiff's Testimony*

Plaintiff testified that she was thirty-one years old, had graduated from high school in 1996, and had graduated in 2005 with a bachelor of arts degree in sociology and peace and conflict studies. (R. at 29-31.) She previously worked as a social worker in the city of Detroit, and in restaurant businesses. (R. at 30.) During her graduate studies at the University of Chicago, she received a scholarship to study abroad in Guyana for a year, and moved there in August 2006. (R. at 31-32.)

In October 2006, she became ill with an environmental illness and severe chemical sensitivities after exposure to a very toxic agent in Guyana that doctors suspected was a pesticide.  (R. at 32.)

Plaintiff testified that Dr. Dean monitored her health for two years in Ann-Arbor, Michigan, and suggested changes in her life for a healthier environment.  (R. at 26, 33.)  She suggested avoidance of certain kinds of chemicals in her environment, recommended a detoxification protocol, gave her prescriptions and nutritional supplements, monitored her nutrition levels, and performed osteopathic manipulation.  (R. at 33.)  Plaintiff testified that she had last seen Dr. Dean in January of 2009, when she moved to Texas.  (R. at 24-26.)  At the time, she was living with her mother in a condo with carpet and gas heating in a subdivision that was "pesticided regularly."  (R. at 34.)  The neighbors around them smoked, and her mother worked out and brought home things on her clothing and person that made her sick at times.  (*Id.*)  She then met someone online with an environmental illness and severe chemical sensitivity, started a relationship with him, and moved to Salado, Texas, to live with him in a safer home that was modified to support his illness.  (R. at 33-34.)  The home had no carpet, just ceramic tiles, safe and non-toxic paint on the walls, special air and water filters, and was in an area with no pesticides.  (R. at 34.)  She could function mildly in that new environment, but still had extreme and debilitating fatigue and sickness, and when the neighbors painted their house or used pesticides, her health deteriorated and became more threatened.  (R. at 34-35.)  She had been seeing Dr. Rea in Dallas to continue her prescriptions but had been unable to afford healthcare.  (R. at 26, 33.)

Plaintiff testified that she could not take traditional medicine and was on special medications, and she had been taking Hydrocortisone and Cortisol for her adrenal dysfunction and fatigue for about a year and a half with no side effects.  (R. at 35-36.)  Since her sickness started, she constantly had memory problems.  (R. at 36.)  Her concentration became worse upon exposure to toxic things,

but even in general, she could not perform tasks requiring mental attention. (*Id.*) She had forgotten a lot of her vocabulary and could not write as well. (*Id.*) Her hands and feet got numb to the point that she could not even open a bottle cap. (*Id.*) She had disturbed sleep at night and woke up with anxiety and panic attacks. (R. at 37.) She mostly slept between ten to twelve hours a night and took multiple naps a day. (*Id.*) Even after twelve hours of sleep, she did not feel refreshed. (*Id.*) Upon exposure to toxic things like paint, pesticides, and cleaning agents, she got severe muscle pain and often joint pain in her elbows and knees. (*Id.*)

### b. VE's Testimony

The VE testified that Plaintiff had past relevant work as a community outreach worker. (R. at 38.) The ALJ asked the VE to opine whether a hypothetical individual of Plaintiff's age and education with the following RFC could perform Plaintiff's past relevant work: occasional climbing, balancing, stooping, kneeling, crouching, crawling; environmentally precluded from all but negligible exposure to elements of weather, vibration, moving mechanical parts, electric shock, hazardous exposed places, radiation, explosives, fumes, odors, dust, gases, and poor ventilation. (R. at 38-39.) The VE opined that the hypothetical individual could not perform Plaintiff's past relevant work but could perform other work existing in significant numbers in the economy, such as the work of a charge account clerk, telequotation clerk, and call out operator. (R. at 39.)

When the ALJ modified the first hypothetical to add mental limitations precluding all but minimal contact with the public, coworkers, and supervisors, the VE opined that the individual could not perform any of the previously identified jobs but could perform other work existing in the economy, such as the work of an addresser, document preparer, surveillance system monitor, and production worker. (R. at 39-40.) When the ALJ again modified the hypothetical to include a reduced range of sedentary work with all of the previous limitations as well as pedal limitations

involving negligible use of foot controls, the VE opined that Plaintiff could still perform the work

of an addresser, document preparer, surveillance system monitor, and production worker. (R. at 40-

41.) In all of the hypothetical situations, at most two absences per month and five minutes per hour

of unscheduled breaks wold be tolerated, but recumbent rest breaks over and above normal work

breaks and lunch periods would not be tolerated. (R. at 41.) If the hypothetical individual was to

be off-task or lose concentration for more than five minutes per hour, she would not be able to

perform any work. (R. at 42.)

## C.    **ALJ's Findings**

The ALJ denied Plaintiff's application for benefits by written opinion issued on December

15, 2009. (R. at 9-16.) At step one, the ALJ determined that Plaintiff had not engaged in substantial

gainful activity since October 19, 2006, the alleged onset date. (R. at 11, ¶ 2.) At step two, he found

that Plaintiff had the following severe combination of impairments: "toxic neuropathy, toxic

encephalopathy, chemical sensitivities, cognitive disorder, and adjustment disorder." (R. at 11, ¶

3.) At step three, he found that Plaintiff did not have an impairment or a combination of

impairments that met or equaled a listed impairment. (R. at 11, ¶ 4.) In his RFC assessment, the

ALJ found that Plaintiff had the capacity "to maintain employment at the level of lifting and

carrying a maximum of 10 pounds; standing and walking 2 hours in an 8-hour workday; sitting 6

hours in an 8-hour workday; negligible climbing, balancing, stooping, kneeling, crouching, and

crawling; negligible use of foot controls; negligible exposure to extreme temperatures, vibrations,

moving mechanical parts, electric shock, hazardous exposed places, radiation, explosives, fumes,

odors, dust, gases, and poor ventilation;" and "minimal contact with the public, co-workers, and

supervisors." (R. at 12, ¶ 5.) He found that Plaintiff was unable to perform her past relevant work,

but given her age, education, work experience, and RFC, could perform other jobs existing in

significant numbers in the national economy.  (R. at 15, ¶¶ 6-10.)  He concluded that Plaintiff had not been disabled since the alleged onset date through the date of his decision.  (R. at 16, ¶ 11.)

## II.  ANALYSIS

**A.**    <u>**Legal Standards**</u>

### 1.    **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3).  Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present.  *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program.  *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income.  *See id.*  Thus, the

Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *Id.*

## 2.    Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992). The Commissioner utilizes a sequential five-step inquiry to determine whether an adult is disabled and entitled to benefits under the Social Security Act:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.    An individual who does not have a "severe impairment" will not be found to be disabled.

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.    If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.    If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability.

*Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### 3. Standard for Finding of Entitlement to Benefits

Plaintiff asks the Court to reverse the Commissioner's decision and award benefits. (Pl. Br. at 21.) When an ALJ's decision is not supported by substantial evidence, the case may be remanded "with the instruction to make an award if the record enables the court to determine definitively that the claimant is entitled to benefits." *Armstrong v. Astrue*, 2009 WL 3029772, at * 10 (N.D. Tex. Sept. 22, 2009). The claimant must carry "the very high burden of establishing 'disability without any doubt.'" *Id.* at * 11 (citation omitted). Inconsistencies and unresolved issues in the record preclude an immediate award of benefits. *Wells v. Barnhart*, 127 F. App'x 717, 718 (5th Cir. 2005). The Commissioner, not the court, resolves evidentiary conflicts. *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

### B. Issues for Review

While Plaintiff generally argues a lack of substantial evidence to support the ALJ's decision, she specifically argues that:

1.       the ALJ erred in evaluating the Plaintiff's credibility;

2.       substantial evidence in the record demonstrates that controlling weight was not given to Plaintiff's treating sources; and

3.       the RFC determination by the ALJ did not accurately portray Plaintiff's mental impairments and substantial treatment.

(Pl. Br. at 4-5.)

## C.     Issue One: Credibility

Plaintiff first contends that the ALJ failed to properly assess her credibility and found her partially credible without ever discussing how he reached his conclusions.  (Pl. Br. at 11-15.)

Credibility determinations by an ALJ are entitled to deference.  *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991).  The ALJ is in the best position to assess a claimant's credibility since the ALJ "enjoys the benefit of perceiving first-hand the claimant at the hearing."  *Falco v. Shalala*, 27 F.3d 164 n.18 (5th Cir. 1994). SSR 96-7p requires the ALJ to follow a two-step process for evaluating a claimant's subjective complaints.  SSR 96-7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996).  First, the ALJ must consider whether the claimant has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms.  *Id.*  Once such an impairment is shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms to determine the extent to which they limit the individual's ability to do basic work activities.  *Id.*  If the claimant's statements concerning the intensity, persistence, or limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a credibility finding regarding the claimant's statements.  *Id.*; *Falco*, 27 F.3d at 164 (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1985)).

The ALJ's credibility determination must be based on a consideration of the entire record,

including medical signs and laboratory findings, and statements by the claimant and his treating or examining sources concerning the alleged symptoms and their effect. SSR 96-7p, 1996 WL 374186, at *2. The ALJ must also consider a non-exclusive list of seven relevant factors in assessing the credibility of a claimant's statements: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, for relief of pain or other symptoms; (6) measures other than treatment the claimant uses to relieve pain or other symptoms (e.g., lying flat on his or her back); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms." *Id.* at *3.

In all cases in which pain or other non-exertional symptoms such as fatigue, weakness or nervousness are alleged, the administrative decision must contain a thorough discussion and analysis of the objective evidence, including the individual's complaints of pain or other symptoms and the adjudicator's own observations. SSR 95-5p, 1995 WL 670415, at *2 (S .S.A. Oct. 31, 1995). An individual's statements with respect to pain and other symptoms alone are not conclusive evidence of a disability and must be supported by objective medical evidence of a medical impairment that could reasonably be expected to produce the pain or other symptoms alleged. 42 U.S.C. § 423(d)(5)(a). The mere existence of pain is not an automatic ground for disability, and subjective evidence of pain does not take precedence over conflicting medical evidence. *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989) (citations omitted).

Plaintiff argues that if a medically determinable impairment is of a severity that could reasonably be expected to cause the pain a claimant alleges, there is no additional requirement that

the claimant's allegations be proved independently. (Pl. Br. at 13-14.)  In the Fifth Circuit, if "pain is linked to an objectively verifiable condition . . . it is not necessary that the pain which allegedly disables the claimant be proved objectively, but it must still be proved by the claimant."  *See Anderson v. Sullivan*, 887 F.2d 630, 633 (5th Cir. 1989).  Here, the ALJ acknowledged a link between her alleged symptoms and her medically determinable impairments, but concluded from objective and other medical evidence that Plaintiff was not telling the truth.  He specifically found that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of her alleged symptoms," but her "statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they were inconsistent" with her RFC.  (R. at 12-13.)

The ALJ explained that there were inconsistences between Plaintiff's allegations and a "paucity of objective medical evidence" to support them.  (R. at 13.)  He pointed out that while Plaintiff was seen in the emergency room on November 27, 2006, due to toxic exposure, she reported the following week that her symptoms had improved and she was somewhat back to normal.  (R. at 13.)  He acknowledged Dr. Dean's statement that Plaintiff had been under her care since March of 2007 for toxic neuropathy, toxic encephalopathy, and chemical sensitivities, but pointed out that Plaintiff's medical symptoms had improved, she had a completely normal examination in October of 2007, there was little evidence of ongoing treatment due to her alleged symptoms, and she lacked motivation to seek medical treatment.  (R. at 14-15.)  He explained that Plaintiff mentioned on several occasions that she had not sought treatment due to lack of funds, and that her lack of motivation to seek medical treatment suggested that her symptoms were not as bothersome as alleged.  (R. at 15.)  The ALJ also considered Plaintiff's allegations that she was

disabled due to memory loss and an inability to concentrate, but pointed out that Dr. Didriksen had assessed her as having a verbal IQ score of 125, a performance IQ score of 113, and a full scale IQ score of 122. (R. at 14.) He further noted that Plaintiff's activities of daily living as reported to Dr. Didriksen were inconsistent with a finding of total disability. (*Id.*) For example, she reported activities throughout the day such as doing internet searches, watching television, talking on the telephone, preparing food, and doing yoga. (*Id.*) Based on the evidence, the ALJ concluded that Plaintiff was capable of work-related activities if she avoided toxic or neurotoxic substances. (*Id.*)

Plaintiff strongly objects to the ALJ's inference that she lacked motivation to seek medical treatment and her symptoms were therefore not as bothersome as alleged.[2] (Pl. Br. at 13-14.) Social Security Ruling ("SSR") 96-7p prohibits an ALJ from drawing inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, such as an inability to afford treatment and a lack of access to free or low-cost medical services, or other information in the case record that may explain infrequent or irregular medical visits or failure to seek medical treatment. SSR 96-7p, 1996 WL 374186, at *7-8. Here, the ALJ specifically noted Plaintiff's statements that she was unable to afford treatment but drew a negative inference from those statements. Even if the ALJ committed an error in concluding that she lacked motivation to seek treatment, however, his credibility determination was substantiated by other evidence of record. *See Sanders v. Apfel*, 136 F.3d 137, 137 (5th Cir. 1998) (per curiam) (similar reasoning).

Because the ALJ applied the proper legal standards and identified substantial evidence to support his credibility assessment, remand is not required. Plaintiff's motion for summary judgment

---

[2] Plaintiff raised this argument as part of her second issue.

is denied on this ground.

**D.**      <u>**Issue Two: Treating Source Opinions**</u>

Plaintiff next argues that the ALJ failed to give controlling weight to the treating source opinions of Dr. Dean and Dr. Didriksen and failed to articulate good reasons for the weight given to their opinions. (Pl. Br. at 15-18.)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. § 404.1527(c)(2). Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source. 20 C.F.R. § 404.1527(d). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has, or has had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. 20 C.F.R. § 404.1527(d). If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id.* § 404.1527(d)(1)-(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physi-

cians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). If evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id.* A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id.* at 455-56. Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453. A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another" or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458.

Here, the ALJ adopted Dr. Dean's and Dr. Didriksen's medical findings that Plaintiff had the severe impairments of toxic neuropathy, toxic encephalopathy, chemical sensitivities, cognitive disorder, and adjustment disorder, and incorporated any limitations based on these impairments into his RFC findings. (R. at 11-12.) However, he rejected their opinions that Plaintiff was unable to work due to her impairments as opinions on the ultimate issue of disability. (R. at 14.) He explained that the opinions were inconsistent with the higher level of functioning shown by the record as a whole; there was medical evidence indicating that Plaintiff's symptoms had improved, there was very little evidence of ongoing treatment due to her alleged symptoms, and her daily

activities did not support a finding of total disability. As determined by the Fifth Circuit, a treating physician's opinion regarding a Plaintiff's disability are legal conclusions and have no special significance. 20 C.F.R. § 416.927(e); *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003). Additionally, "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).

Plaintiff argues that the ALJ never articulated what objective medical evidence conflicted with the opinions of Drs. Dean and Didriksen. (R. at 17.) The ALJ specifically pointed out that Dr. Cherfan, who evaluated Plaintiff for fatigue, multiple chemical sensitivities, environmental illness, and neurotoxicity, found her to have a completely normal examination. (R. at 13-14.) The ALJ also generally found that Plaintiff's symptoms had improved, and that she was able to engage in daily activities that were inconsistent with her allegations of disabling limitations. (R. at 14.) He made this finding based on the presence of medical records noting improvement in her symptoms (R. at 260, 264), numerous physical examinations that revealed no abnormalities in her respiratory, cardiovascular, musculoskeletal, or neurological systems (R. at 249, 258-59, 262-63, 300, 334-35), and medical tests and labs with normal results except for an adrenal deficiency (R. at 262-63, 299-300). Since the ALJ weighed the opinions of Drs. Dean and Didriksen against other medical evidence of record, including the medical opinion of examining physician Dr. Cherfan, he was not required to give their opinions controlling weight or to perform a detailed analysis of their views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2). The ALJ's rejection of their opinions is also supported by substantial evidence. Plaintiff's motion for summary judgment is denied on this ground.

## E.    RFC Determination

Plaintiff also argues that ALJ's determination did not accurately portray Plaintiff's physical and mental impairments and her substantial treatment. (Pl. Br. at 18-21.)

Residual functional capacity is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1). Residual functional capacity "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). "The ALJ is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). An ALJ may consider an individual to have no limitation or restriction with respect to a functional capacity when there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction. SSR 96-8p, 1996 WL 374184, at * 1. An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. *Id.* An ALJ's decision can be supported by substantial evidence even if the ALJ does not specifically discuss all evidence that supports his decision or all evidence that was rejected. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994). However, the ALJ must explain his decision. *Id.*

Here, after making a credibility determination regarding Plaintiff's alleged limitations and evaluating the medical evidence of record including treating physician opinions, the ALJ concluded that Plaintiff had the capacity "to maintain employment at the level of lifting and carrying a maximum of 10 pounds; standing and walking 2 hours in an 8-hour workday; sitting 6 hours in an

8-hour workday; negligible climbing, balancing, stooping, kneeling, crouching, and crawling; negligible use of foot controls; negligible exposure to extreme temperatures, vibrations, moving mechanical parts, electric shock, hazardous exposed places, radiation, explosives, fumes, odors, dust, gases, and poor ventilation;" and "minimal contact with the public, co-workers, and supervisors." (R. at 12, ¶ 5.)

Plaintiff argues that the ALJ's determination that she was able to stand and walk two hours in an eight hour workday is unsupported by evidence and is inconsistent with his step two finding that she had the severe impairment of toxic neuropathy. (Pl. Br. at 20.) An ALJ's assessment of the claimant's RFC is a different inquiry than his step two consideration of whether a claimant has a severe impairment, and therefore different findings at these two levels are not necessarily inconsistent with each other. *See Quigley v. Astrue*, 2010 WL 5557500, at *8 (N.D. Tex., Sept. 8, 2010). Here, nothing in the record indicated that Plaintiff was unable to stand or walk for two hours and would experience pain or other limitations when she did. SSR 96-8p, 1996 WL 374184, at *1. Instead, there was evidence that Plaintiff experienced severe pain only when exposed to toxic things (R. at 37) and was assessed to have no musculoskeletal abnormalities (R. at 249, 258-59, 300, 334-35, 381). The ALJ's finding that Plaintiff could stand and walk for two hours in an eight hour workday is therefore supported by the record.

Plaintiff also argues that the ALJ's finding that she could be exposed to negligible amounts of electrical shock, hazardous exposed places, radiation, explosives, fumes, odors, dust, gases, and poor ventilation, is unsupported by evidence and is inconsistent with his finding that she had a severe impairment of chemical sensitivities. (Pl. Br. at 20.) As discussed, the two findings are not necessarily inconsistent with each other. Additionally, no medical doctor had a specific opinion on

this point, and the medical record indicated that Plaintiff was able to attend a number of physician's appointments, as well as occasionally shop and leave her house. In completing a social security questionnaire, Plaintiff specifically stated that she went out two to three times a weeks, usually accompanied by her mother in case she got sick. (R. at 173.) She went shopping for organic food every other week for an hour and a half, went to the doctor every three weeks, and went to the sauna once a week. (R. at 173-74.) While Plaintiff now claims that she wears a respiratory mask when she goes outside and takes other precautions, she does not point to any evidence in the record to that effect. The ALJ's finding was supported by substantial evidence.

Plaintiff further argues that the ALJ found at step three and in his psychiatric review technique that she had moderate limitations in concentration, persistence, or pace, but failed to include these limitations in his RFC determination. (Pl. Br. at 18-19.) Defendant responds that the ALJ is not required to incorporate the actual ratings or conclusions of the technique into his RFC finding. (D. Br. at 11.) The psychiatric review technique is described in 20 C.F.R § 404.1520a; it requires an ALJ to assess an individual's limitations and restrictions from mental impairments in categories identified in "Paragraph B" and "Paragraph C" criteria of the adult mental disorders listings. "Paragraph B" contains four broad functional areas: activities of daily living; social functioning; concentration, persistence, and pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(b)(2) & (c)(3); 20 C.F.R. Pt. 404, Subpt. P. App. 1, § 12.00. The first three functional areas are rated on a five-point scale: none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). The fourth functional area is rated on a four-point scale ranging from "none" to "four or more episodes." *Id.*

The limitations identified in paragraph B "are not an RFC assessment but are used to rate the

severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." 1996 WL 374184, at *3. "The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders. . ." *Id.* The assessment includes consideration of the claimant's abilities to understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers, and work situations; and deal with changes in a routine work setting. *Id.* at *6. While the ALJ is not required to use the exact language from his psychiatric review technique, he must consider all of Plaintiff's limitations including those found in the technique. *See Moore v. Barnhart*, *Collins v. Astrue*, 2010 WL 3245457, at *6 (M.D. Fla, Aug. 17, 2010).

Here, the ALJ used the psychiatric review technique to find that Plaintiff had moderate limitations in her ability to maintain concentration, persistence or pace, but he failed to make any further assessment of this finding in his RFC determination or to incorporate it in his hypothetical questions to the VE. This failure by the ALJ constituted reversible error. *See id.* Defendant argues that the error does not affect the ALJ's finding that Plaintiff could perform unskilled jobs because unskilled jobs are by definition simple. As determined by several courts, a finding that Plaintiff can perform unskilled work is fatally flawed where the ALJ has found Plaintiff to have moderate limitations in concentration, persistence, or pace. *See Otte v. Commissioner of Social Security*, 2010 WL 4363400, at * 11 (N.D. Tex. Oct. 18, 2010) (summarizing those cases); *see also Wiederholt v. Barnhart*, 121 Fed. App'x 833, 839 (10th Cir. 2005) (when an ALJ rules a claimant has "moderate" limitations in concentration, persistence, or pace, an RFC finding that a claimant retains the ability to perform "unskilled" work is insufficient).

The ALJ committed error in failing to fully assess his psychiatric review finding at step three concerning Plaintiff's concentration, persistence, or pace. Without a more detailed function-by-function analysis of Plaintiff's mental limitations in accordance with SSR 96-8p, however, the Court cannot decide whether Plaintiff is disabled or is entitled to benefits. Plaintiff's motion for summary judgment on this ground is granted, and the case is remanded to the Commissioner for a full assessment of Plaintiff's mental RFC and new VE testimony addressing whether a significant number of jobs exist within Plaintiff's physical and mental RFC. *See Otte*, 2010 WL 4363400, at *13.

### III. CONCLUSION

Plaintiff's motion for summary judgment is **GRANTED in part**, Defendant's motion for summary judgment is **DENIED in part**, and the case is **REMANDED** to the Commissioner for reconsideration consistent with this opinion.

**SO ORDERED,** on this 9th day of February, 2011.


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE